**Choctaw County School District, Mississippi**
**Expert Report of Leonard B. Stevens, Ed.D**
**March 6, 2013**

## A.  Background

Choctaw County School District has been under Court supervision
for desegregation since at least 1970 and is seeking to modify
its current desegregation plan.

I have been asked by the U.S. Department of Justice to analyze
the status of desegregation in the District and the District's
proposed modification of the current desegregation plan.  In
addition, should I conclude that the District's proposed
desegregation plan would produce less desegregation than is
practicable and/or is inequitable, I have been asked to
formulate an alternative plan.

This report responds to these requests.

## B.  Qualifications

1.  <u>Experience</u>

I have worked in school desegregation since 1976, both as
an administrator and as a consultant, including 10 years as the
full-time Federal court monitor in Cleveland, Ohio.

I have worked as a full-time school consultant since 1990,
advising on race-related issues, primarily school desegregation.

My work in desegregation has included student assignment,
staff assignment, magnet schools, staff training, school
organization, equity review, program monitoring, compliance
analysis, and school-community relations.

Prior to 1990, I served in the following administrative
positions:

• Federal court monitor of school desegregation in the Cleveland (OH) City School District: for 10 years; appointed by the Chief Judge of the U.S. District Court, Northern District of Ohio;

• chief executive of a consortium of 24 school districts in metropolitan Milwaukee: for two years; the consortium provided support to school districts engaged in voluntary inter-district school desegregation pursuant to a consent decree;

• chief executive of a foundation-funded coalition of more than 60 community-based organizations in Cleveland OH: for two years; the coalition developed civic leadership in support of school desegregation;

• special assistant to the Chancellor of the New York City Public Schools: for three years; at the onset of school system decentralization in 1970, serving as lead policy advisor to the Chancellor as well as drafter of the Chancellor's public papers.

My litigation-related work has involved more than 30 school systems nationally, including 10 years as a full time Federal court monitor and more than 10 assignments from the U.S. Department of Justice. I have constructed school desegregation plans and analyzed compliance with plans.

In my non-litigation consulting, I have worked for school districts in New Jersey, Connecticut, California, Minnesota, South Carolina and Tennessee. I have taken advisory and training assignments for federally funded desegregation assistance centers in Michigan, Florida and Pennsylvania. I have consulted for desegregation monitoring bodies in St. Louis, Indianapolis, Cleveland, St. Paul, Ann Arbor MI and Ferndale MI. I have consulted for state departments of education in Minnesota and Alabama.

My doctor of education degree is from the University of Massachusetts-Amherst. I hold a superintendent's certificate from the state of Massachusetts.

Published articles are found in my vita.

2. <u>Prior Testimony</u>

I have given court testimony as an expert witness in the following cases: Yonkers NY (*USA and Yonkers Branch NAACP v. Yonkers*); Fort Wayne IN (*Parents for Quality Education with Integration v. Fort Wayne Community Schools,* a fairness hearing); Muscogee County GA (*Lockett v. Board of Education*) on two occasions; Topeka KS (*Brown v. Board of Education*) on two occasions); Hillsborough County FL (*Manning v. Board of Public Instruction*) on two occasions; New Castle County DE (*Coalition to Save our Children*); St. Louis (*Liddell*); Duval County FL (*Jacksonville Branch NAACP v. Duval County School Board*); Benton Harbor MI (*Berry v. School District of Benton Harbor et al*, fairness and unitary status hearings); Charlotte-Mecklenburg NC (*Swann v. Charlotte-Mecklenburg Board of Education*); Hartford CT (*Sheff v. O'Neill*); Tangipahoa Parish LA (*Moore v. Tangipahoa Parish School Board*); and Nashville (*Spurlock v. Fox*).

I provided depositions in the above cases, except Fort Wayne, Charlotte-Mecklenburg and Nashville.  I also have provided depositions in the cases of San Jose CA (*Vasquez v. San Jose USD*), Midland TX (*USA, Coleman et al v. Midland USD*) on two occasions, and Covington County MS (*USA v. Covington County School District*).  I provided a deposition in a non-desegregation case, *Krystal Riley v. Wyoming MI Public Schools.* In another non-desegregation case, I provided declarations regarding school monitoring protocols and practices *(Emma C. v. Delaine Eastin)* (Ravenswood CA).

Of the court and deposition testimony cited above, the following were unitary status cases: Benton  Harbor, Hillsborough County, San Jose, Muscogee County, New Castle County, Midland, St. Louis, Duval County and Charlotte-Mecklenburg.

In addition, I have worked as an expert on desegregation cases in Aldine TX, Ector County TX, Seminole County FL, Rocky Mount NC, Franklin Parish LA, Gadsden AL, Tuscaloosa AL, Jackson-Madison County TN, Chicago IL, San Francisco CA, Tucson AZ, Pickens County AL and Fayette County TN where testimony was not required.

I represented the plaintiff-intervenors in pre-trial settlement negotiations in the Milwaukee metropolitan school desegregation case (*Milwaukee*).

I testified before the Pennsylvania Human Relations Commission on the subject of school desegregation.

During the 10 years I served as Federal Court monitor in the Cleveland school desegregation case (*Reed v. Rhodes*), I filed approximately 200 monitoring reports with the Court.

**C.  Current Status of Desegregation in Choctaw County**

1.  The Choctaw County school system enrolls 1,521 students; 35% are Black.

2.  The system is organized by three attendance zones: French Camp, Weir, and Ackerman.

   a.  French Camp operates a Pre-kindergarten through Grade 8 school.

   b.  Weir operates a pre-kindergarten through Grade 12 school.

   c.  Ackerman operates two schools: a pre-kindergarten through Grade 6 school and a Grade 7 through 12 school.

3.  The District thus operates a total of four schools.

4.  However, this count is a function of budgeting and staffing, not instruction.  As a matter of instructional organization, based on my visits to the schools, the District actually operates eight instructional units, as shown below. (2012-13 data)

|  | Enrollment | % Black |
|---|---|---|
| **French Camp** | | |
| PK-6[1] | 169 | 27% |
| 7-8 | 67 | 18% |
| **Weir** | | |
| PK-6 | 183 | 62% |
| 7-8 | 51 | 65% |
| 9-12 | 106 | 58% |
| **Ackerman** | | |
| PK-6 | 526 | 29% |
| 7-8 | 163 | 30% |
| 9-12 | 256 | 27% |
| **Districtwide** | | |
| PK-6 | 878 | 35% |
| 7-8 | 281 | 33% |
| 9-12 | 362 | 36% |
| Total | 1,521 | |

5.  At present, two of the three elementary schools (PK-6) are within a desegregation standard of plus or minus 15 points of the districtwide average for Black students.[2]  See Table 1.

    a.  The third elementary school, Weir, is not within the standard.

_____

[1] PK throughout denotes Pre-Kindergarten.

[2] This is a commonly used desegregation standard.  I use it here because I find no reference to a statistical standard in the law of this case.  I analyze race proportions by grade level of school, since these are the cohorts that actually attend school together.

While to my knowledge there is no statistical standard for school desegregation in the law of  this case, it is clear from the Consent Decree of August 5, 1970 that the schools were to be desegregated to a standard even stricter than +/- 15, the standard I have used.  At the time of the Consent Decree, school enrollment in Grades 1-12 district-wide was 42% Black (it is impossible from data available to break out the data by grade level of school). Under the Court-approved plan, each attendance center (Ackerman, Weir and French Camp) was to have schools with Black proportions from 34% to 50%, i.e. an effective Black range of +/- 8 points.

    b. At the middle grades level (Grades 7 and 8), Weir is non-compliant.

    c. At the high school level (Grades 9-12), Weir is non-compliant.

| | Districtwide % Black | Meets +/- 15 Standard | Fails +/- 15 Standard |
|---|---|---|---|
| Grades PK-6 | 35% | French Camp/27% Ackerman/29% | Weir/62% |
| Grades 7-8 | 33% | French Camp/18% Ackerman/30% | Weir/65% |
| Grades 9-12 | 36% | Ackerman/27% | Weir/58% |

## D. Criteria for a Desegregation Plan

All things considered--most importantly the obligation of the District to desegregate its schools--a desegregation plan for this District at this time should be desegregative, equitable and instructionally sound, while also meeting the District's goal to conserve funds.

## E. Analysis and Opinions

 1. <u>The District Plan.</u> See Table 1.

 The District plan would reassign Weir students in Grades 7-8 and 9-12 to Ackerman.
 Other schools in the District would be unchanged.
 The only other change effected by the District plan would be to cause French Camp high school students to attend high school in Ackerman instead of in Weir. See Table 1.

    a. The District plan fails the desegregative criterion.

1) As a result of the closing of Grades 7-12 at Weir, desegregation would benefit as follows: Weir students in Grades 7-8 and 9-12 who now attend racially identifiable schools would attend desegregated schools at Ackerman.

2) However, the plan would leave in place a racially identifiable elementary school at Weir despite the potential to desegregate it in combination with French Camp.

3) In fact, the District Plan is not motivated by a District goal to enhance desegregation but, rather, by the District's financial condition. "The District's financial condition is the principal motivation for the proposed modification." (Defendant's Combined Motion and Memorandum to Modify Desegregation Plan and to Grant Expedited Consideration of this Motion,October 23, 2012, page 3)

4) The plan's desegregative effect is thus incidental, not purposeful, the District's status as a court-supervised district notwithstanding.

5) The shape and content of the plan thus is open to question since it admittedly is not driven by a goal of achieving maximum practicable desegregation. In this connection, see E.1.b. immediately below.

b. The District plan fails the equitable criterion.

1) The plan would place a disproportionate burden on Black students.

a) Of 157 students who would be reassigned, all in Grades 7-12, 94 are Black, 63 are white.

b) The 94 Black students represent 42% of all Black students in the District in Grades 7-12.

c)The 63 white students represent 15% of all white students in the District in Grades 7-12.

d) In brief, Black students would be reassigned at a rate nearly three times the rate of white students.

| | **Students Reassigned by District Plan** | | | |
|---|---|---|---|---|
| | Black | White | Other | Total |
| French Camp PK-8 | 0 | 0 | 0 | 0 |
| Ackerman PK-12 | 0 | 0 | 0 | 0 |
| Weir 7-12 | 94 | 63 | 0 | 157 |
| | | | | |
| Total in Grades 7-12 | 225 | 411 | 7 | |
| % of Group reassigned | 42% | 15% | 0% | |

2) With regard to the three attendance zones, the District plan is inequitable because it leaves French Camp and Ackerman untouched while being focused exclusively on Weir. See Table 1.

a) In this rural district, community context is a relevant consideration. Ackerman is the largest settlement in the county, French Camp is the smallest. For each of these communities, in particular Ackerman and Weir where high schools are located, the schools are focal points. The high school sports teams in Ackerman and Weir are sources of community identity and inter-generational pride.

b) The District plan would close the high school at Weir and, in addition, remove the middle grades from the campus. The campus would house elementary grades only and would have the smallest student enrollment in the District.

c) As a result, the District plan would be devastating to the town of Weir as well as dramatically shrink and alter the character of the Weir school campus.

|  | Students on Campus 2012–13 | District Plan |
|---|---|---|
| French Camp, PK-8 | 236 | No change |
| French Camp, 9-12 | Assigned to Weir | *Re-assign to Ackerman* |
| Ackerman, PK-6 | 526 | No change |
| Ackerman, 7-8 | 163 | Increase to 214 |
| Ackerman, 9-12 | 256 | Increase to 362 |
| Weir, PK-6 | 183 | No change |
| Weir, 7-8 | 51 | *Re-assign to Ackerman* |
| Weir, 9-12 | 106 | *Re-assign to Ackerman* |

d) In desegregation planning, school capacities, locations and facilities are major factors in fashioning a viable plan. In a viable desegregation plan, school capacities are sufficient for projected enrollments; locations make schools reasonably accessible to the students they would serve; facilities are adequate for the instructional program to be housed in each school, and the plan as a whole is as fair as possible to all races and communities.  In the District plan, these factors seem to play minor roles, in particular with regard to the location of a consolidated middle grades school.

1) With regard to capacity: the District was asked to provide data on the capacity of each of its schools but it did not do so.  (November 20, 2012 Choctaw Response to November 5, 2012 Request, pages 588 and 596-602)

2) Nevertheless, there is no reason to conclude that the reason the Ackerman campus was selected to house a consolidated middle grades school is that the Weir campus lacked capacity for such a school.  In fact, the initial plan proposed by the Superintendent and approved by the Board of Education placed the consolidated middle school for Grades 6-8 at the Weir campus. (District's November 30, 2012 Response to the November 5, 2012 Information Request, page 4)

3) With regard to location: the District plan does not explain the selection of Ackerman as the

site for a consolidated middle grades school on the ground that
it is more accessible to children district-wide than the Weir
campus.  Indeed, it could not do so, since the Weir campus, not
Ackerman, is in the center of the county.

      4) With regard to facilities: the
District plan does not explain the selection of Ackerman as the
site for a consolidated middle grades school on the ground that
Ackerman's facilities are superior to those of Weir.  In fact,
the District reports, "The facilities at Weir Attendance Center
are in overall satisfactory condition."  The District makes the
same statement about Ackerman High School. (November 30, 2012
Response to the November 5, 2012 Information Request, page 3)

      5) Instead of analyzing school
capacities, locations and facilities, the District bases its
choice of Ackerman as the site for a consolidated middle grades
school on an analysis of enrollment loss over time and school-
based per pupil costs. (November 30, 2012 Response to November
5, 2012 Information Request, page 5)  On the basis of its
analysis, the District ruled out Weir as an appropriate site for
a consolidated middle grades school.

      i) In my view, enrollment loss
over time at Weir does not rule out placement there of a
consolidated middle grades school.  As stated above, the
critical factors ought to be capacity, location, and facilities,
and overall fairness of the plan as a whole.  Whether a school
has been losing or gaining students over time should not be
dispositive.

      ii) School-based per pupil costs--
<u>as they are at present</u>--are not a sound reason, in my view, to
select sites for schools in a desegregation plan.  Any
desegregation plan will make changes in the status quo--it is
the future savings or costs that will result from the plan that
are relevant.  The District plan offers no evidence that a
consolidated middle grades school would be more cost-efficient
at Ackerman than at Weir.

      e) Compounding the negative impact on Weir,
the District plan fails to recognize the practicalities of

consolidating two high schools and thus is insensitive to the foreseeable impact on Weir students and families.

              1)The District plan would consolidate Weir and Ackerman high schools by assigning Weir students to Ackerman. In effect, Weir High School would be closed.[3] There are no plans to change the name of the consolidated high school, or to re-do the colors of the school, or the mascot or nickname of the school's athletic teams, or the school's band uniforms.

              2) The District views the consolidation as not a merger of two high schools with independent histories but as a simple absorption of the smaller of the two high schools by the larger one.

              3) In my view, this is neither wise nor fair, and compounds unnecessarily the foreseeable negative effect on the town of Weir and its high school students.

      c. At best, the District plan begs the question on the instructionally sound criterion.

           1) The plan consolidates all of the District's high school students (Grades 9-12) at one high school. The plan then fails to do the same thing with its middle grades.

           2) The plan consolidates Grades 7 and 8 students from Ackerman and Weir in one school, but leaves these grades at French Camp.

           3) The plan does not explain the French Camp anomaly in grade organization.

      d. The District plan fails the conserve funds criterion.

           1) The central tactic of the District plan to conserve funds is consolidation of schools. Thus, two high

---

[3] The District asserts that "no school will be closed." (Defendant's Combined Motion and Memorandum to Modify Desegregation Plan and to Grant Expedited Consideration of this Motion, October 23, 2012, page 4) But this is word-play. Weir High School would no longer exist, which means it would be closed.

schools would be turned into one, and the two largest middle grades units would be combined.

2) But, as noted, the plan leaves Grades 7-8 at the French Camp school.  Since nearly half of the students at the French Camp school do not reside with their families in the school zone and do not pay tuition to attend the school, the choice of the District plan to leave the school as-is is bewildering.[4]

3) In fact, by doing so, the District plan would exacerbate inefficiency, because middle grades students at French Camp who are now transported weekly to the Weir campus for specialized courses would have to be transported to Ackerman, an even longer distance.

4) The District plan, by removing all secondary grades (Grades 7-12) from Weir, would leave unused at Weir significant physical assets designed for the use of secondary students.  The District has no plans for alternative use of

---

[4] French Camp School is unique in the District.  The village of French Camp is also the home of French Camp Academy, a private high school which includes boarding students.  The Academy is located adjacent to the District's French Camp school.  Academy students in elementary grades through Grade 8 walk from the Academy's dormitories to the District's French Camp school.

It is District practice to enroll in its French Camp school boarding students from the private Academy in all grades prior to high school, and not charge tuition to the Academy or the students' parents.  District records show that 53 Academy boarding students attend the District's French Camp school. (District Response to Information Request of December 20, 2012, pages 340-345)

In addition, pursuant to state legislation, the District's French Camp school enrolls students without charge who live in Montgomery and Attala counties.  A total of 58 students from Attala and Montgomery counties attend the District's French Camp school. (District Response to Information Request of December 20, 2012, pages 371-372)

Thus, 111 of the 236 students attending the French Camp school either live outside the School District or are boarding students at a private school, none of whom pays tuition to attend the school.  Only 125 students live with their families in the French Camp attendance zone.

If the school served Grades PK-6 like the Ackerman and Weir schools, the 18 students in Grades 7 and 8 who live in the attendance zone with their families would attend middle grades at Weir, further reducing the French Camp enrollment to 107.  This would make the French Camp school the smallest PK-6 school in the District and therefore  a prime candidate to be closed or to be restructured in a time of fiscal pressure.  The District plan, however, leaves it intact as a PK-8 school.

these assets, and does not explain the financial implications of
what amounts to abandonment of these facilities:

- football field and field house
- baseball and softball fields
- high school library
- chorus room
- science lab
- agriculture and plant science lab
- information and communications technology lab
- gym, locker rooms and weight room
- greenhouse
- indoor baseball training facility

e.  In sum, I find that the District plan does not
meet the criteria of desegregative, equitable and
instructionally sound, while also meeting the District's goal to
conserve funds.

2.  <u>Alternative Plan A.</u>  See Table 2.  For the reason of
not modifying the District's current grade organization, I would
recommend this plan.

a.  Operate a district-wide high school, Grades 9-12,
at what is now Ackerman High School.  (This is what the District
plan proposes.)

1) It makes practical sense for a district of
this size to operate a single high school.

2) The choice of Ackerman as the site for the
high school makes practical sense chiefly because it houses a
substantial career and technical center that is unique in the
District and has significant educational value to high school
students.

b.  Operate a district-wide middle grades school
(Grades 7 and 8) at the Weir campus.  (The District plan
proposes consolidation of these grades, though at Ackerman.)

1) It makes practical sense for a district of
this size to operate a single middle grades school.

13

2) As a matter of equity, this school would be housed at Weir, thus off-setting in part the removal of its high school.

c.  Operate an early childhood center at French Camp.

1) In light of the small enrollment size at French Camp of students who actually reside in the District (see footnote 4), French Camp would be re-purposed as an early childhood center serving Grades Pre-Kindergarten through 2.

2) This grade reorganization would assign French Camp student in Grades 3-6 to Weir, thereby desegregating the PK-6 elementary school at Weir, a desegregation benefit.  French Camp students in Grades 7-8 would attend the district-wide middle grades school at Weir.

d.  As a result, all schools in the District would conform to a plus/minus 15 desegregation standard, the basic current grade organization of the district for secondary grades (7-12) would be undisturbed, and the District would operate a single high school and single middle grades school.

e.  This alternative plan would cause more students to be reassigned than the District plan.  However, under this alternative plan the burden of reassignment would be shared equitably across racial groups.

1) Of all white students in the District in Grades 3-12, the grades subject to reassignment, 38% would be reassigned.

2)Of all Black students in the District in Grades 3-12, 40% would be reassigned.

f.  This plan would house middle grades students at the Weir campus, thereby allowing them to use valuable facilities designed for students in the secondary grades.

g.  This plan would limit the negative impact on the Weir community.

14

h.  In my view, this plan meets the criteria of desegregative, equitable and instructionally sound, and contributes no less than the District plan to the District goal of conserving funds since it uses the same tactic of consolidation as the District plan.

3.  <u>Alternative Plan B</u>.  See Table 3.  For the instructional reason of creating a three-grades middle school, I would recommend this plan.

a.  Alternative Plan B is the same as Alternative Plan A with this exception: the district-wide middle grades school would house Grades 6-8 instead of Grades 7-8.

b.  This plan would have the same advantages as Alternative Plan A.

c.  In addition, this plan would offer the District the opportunity to build an instructional program in three middle grades rather than two grades for the purpose of further strengthening high school readiness of middle school graduates as they enter high school at Grade 9.

The original District plan proposed this grade organization for a consolidated middle grades school. (November 30, 2012 Response to the November 5, 2012 Information Request, page 4)

d.  In my view, this plan meets the criteria of desegregative, equitable and instructionally sound, and contributes no less than the District plan to the District goal of conserving funds since it uses the same tactic of consolidation as the District plan.

4.  <u>Community Impact</u>

a.  The comparative impact of the District plan and the two alternative plans is shown below.

15

b. The District plan would reduce campus size at Weir to 183 students, thereby making it the smallest campus in the District. Ackerman would have six times the enrollment of Weir.

c. Alternative Plans A and B would effect a more balanced distribution of students between the two largest campuses, Ackerman and Weir, while reducing campus size at French Camp to a level not inconsistent with the size of that community.

|  |  | Current | District Plan | Alt. Plan A | Alt. Plan B |
|---|---|---|---|---|---|
| Weir | | | | | |
| | Grades | PK-12 | PK-6 | PK-8 | PK-8 |
| | Campus Enrollment | 340 | 183 | 545 | 616 |
| Ackerman | | | | | |
| | Grades | PK-12 | PK-12 | PK-6 + 9-12 | PK-5 + 9-12 |
| | Campus Enrollment | 945 | 1,102 | 888 | 817 |
| French Camp | | | | | |
| | Grades | PK-8 | PK-8 | PK-2 | PK-2 |
| | Campus Enrollment | 236 | 236 | 88 | 88 |

5. <u>Implementation Steps</u>.

The District plan is largely silent on specific implementation steps.[5] These implementation steps should be required of the District:

a. The consolidated high school should be re-named Ackerman-Weir High School.

b. The consolidated middle grades school should be re-named Choctaw County Middle School or Choctaw Middle School.

c. Ackerman-Weir High School and Choctaw County Middle School, as newly created and re-named district-wide

---

[5] At the January 31, 2013 meeting with the DOJ litigating attorney, District leaders evidenced little or no intention to develop and execute meaningful implementation plans for merging two high schools, engaging communities and stakeholders in the change process, and avoiding excessive negative impact on the Weir campus and Weir community.

schools, should redesign all school symbols, e.g. school colors, team nicknames, team mascots, team uniforms, school band and cheerleader uniforms, as well as school signage, and engage affected students and families from all three attendance zones in this update effort.[6]

     d.  The District should staff the two consolidated schools (Ackerman-Weir High School and Choctaw County Middle School) with a view toward creating in each school from the time of consolidation a blend of staff that collectively has knowledge of and is familiar with students who are being relocated to new schools.

     e.  The District should take special care in designating coaching staffs for the athletic teams, teachers who advise/lead extracurricular groups, administrators and counselors, and support staff in the two consolidated schools with a view toward making such staff in the consolidated schools from the time of consolidation recognizable to students who are being relocated to new schools.

     f.  The District should take steps to combine parent, community and school-support groups heretofore based in either Ackerman or Weir into merged groups so that the two consolidated schools benefit from external support with roots in both towns.

     g.  The athletic teams of the two consolidated schools (Ackerman-Weir High School and Choctaw County Middle School) should alternate the location of their respective home games between the athletic facilities in Ackerman and Weir.

     h.  The District, to compensate for the relocation of high school grades from Weir, should locate at the Weir campus

---

[6] The District is of the view that this is not economically feasible and therefore need not be considered. (DOJ interview of District staff, January 31, 2013)  However, this view clearly is based in part on the District view that Weir High School will be closed and its students absorbed into Ackerman High School, resulting simply in a larger Ackerman High School.  If the District viewed the high school consolidation as a merger of two high schools, as I believe it should, it would recognize the need to re-cast the symbols of the merged and re-named high school so that students and families from both the Weir and Ackerman communities would sense ownership of the merged high school.  To meet this need, the District is not required to take the most expensive course of action, but it is required to take meaningful steps.  By reaching out to community supporters, it might well defray some costs.  By engaging students in the planning process, it would ease implementation of the overall consolidation plan.

as many district-wide programs as possible, such as the District's GED program and similar programs. The District should explore sponsoring and placing at Weir district-wide adult education programs. It should also explore the potential for arranging for the offering of community college courses at Weir. In brief, given Weir's location in the center of the District, the District should work to make the Weir campus a significant contributor to the District as a whole.

       i. District leadership, beginning now, should engage in district-wide outreach to the communities and constituencies served by the school system to explain plans, the rationale for the plans, and to hear and consider the views of the District's constituencies: parents, community leaders, students and District staff. Such two-way communication is an inherent component of implementation of a student reassignment plan.

       j. The District, in making implementation plans, should seek the pro bono assistance of the Southeastern Equity Center in Florida, a federally funded technical assistance center with expertise in race-related school matters.

**F. Compensation**

I am retained as a desegregation consultant by the U.S. Department of Justice at the rate of $1,000.00 per day.

**G. Basis for Opinions**

I visited all the schools in the District on January 29 through 31, 2013. I toured the schools accompanied by their respective principals, and I attended an interview on January 31 conducted by the DOJ litigating attorney of the District's superintendent, business manager, and director of curriculum/special education.

I have reviewed the following documents:

    Consent Decree, August 5, 1970.
    Order, November 20, 1989.

Defendants' Answer and Proposed Plan for Desegregation of Public Schools of the Choctaw County School District, July 23, 1970.

District reports to the Court: March 1, 2009, October 1, 2009, March 1, 2010, August 9, 2010, March 1, 2011, October 1, 2011.

Defendant's Combined Motion and Memorandum to Modify Desegregation Plan and to Grant Expedited Consideration of this Motion, October 23, 2012.

Information Request, Department of Justice to Holmes Adams, November 5, 2012; District November 20, 2012 Response, 616 pages; and District November 30, 2012 Response, 178 pages.

Information Request, Department of Justice to Holmes Adams, December 20, 2012; and District Response, 377 pages.

Glen Beard, Choctaw County Superintendent, "CCSD Restructuring Proposal Modified by Board," The Choctaw Plaindealer, October 25, 2012.

/s/Leonard B. Stevens
LEONARD B. STEVENS, ED.D.

**Leonard B. Stevens, Ed.D.**
Box 2479 • Sarasota Florida 34230
Telephone: 941.355.5258 • Fax: 813.319.3463
Email: Leonard.Stevens@me.com

## EXPERIENCE

1990-　　　　　School Consultant
　　　　　　　　based in Florida

　　　　　　　　*Consulting nationally for school districts and other entities.　Planning,
　　　　　　　　assessment, training assignments.*

1988-90　　　　Director, Compact for Educational Opportunity
　　　　　　　　Milwaukee, Wisconsin

　　　　　　　　*Chief executive of consortium of 24 public school districts.*

　　　　　　　　Planned and developed new agency for school districts and a civil rights
　　　　　　　　organization previously engaged in litigation to support second
　　　　　　　　largest interdistrict school-choice program in U.S.

　　　　　　　　Budget and personnel management.  Doubled operating budget,
　　　　　　　　generated comprehensive program plan, operationalized
　　　　　　　　services to school districts in first year.

　　　　　　　　Accountable to 46-member coordinating council and 8-member operations
　　　　　　　　committee.

1978-88　　　　Director, Office on School Monitoring & Community Relations
　　　　　　　　Cleveland, Ohio

　　　　　　　　*Chief executive of special agency to assess the Cleveland City School
　　　　　　　　District* for federal court.

　　　　　　　　Planned, developed, staffed new agency with unique mission in school
　　　　　　　　desegregation program.

　　　　　　　　Budget and personnel management.  Generated $2.5 million in federal
　　　　　　　　grants for only school monitoring agency in U.S. ever to receive federal
　　　　　　　　funding.

Directed staff and consultants in production of assessment reports on instruction,finance, management, organization, decentralization, planning.

Liaison with state, local and federal officials; media relations; relations with parent, community and citizen groups.

Accountable to Chief Judge, U.S. District Court, Northern District of Ohio, and 18-member citizen commission.

1976-78    Director, Greater Cleveland Project
           Cleveland, Ohio

           *Chief executive of nonprofit coalition of 60-70 community-based organizations.*

           Planned and developed new agency with mission of civic leadership for racial integration of schools.  Coalition composed of social service agencies, religious institutions, civic and parent organizations.  Generated $700,000 in foundation and government funding.

           Budget and personnel management.

           Directed formation of resource center for education of parents and citizens on school issues.  Directed public information effort: 700 workshops held on school issues for community leaders and parents, 600,000 pieces of literature distributed, 400 community groups served.  Extensive public speaking and media relations.

1973-76    Research Assistant
           University of Massachusetts-Amherst

           *Full-time doctoral studies.  Assistant to Professor Harvey B. Scribner, former Chancellor, New York City Public Schools.*

1970-73    Special Assistant to Chancellor, New York City Public Schools
           New York, N.Y.

           *Senior policy advisor to chief executive of the New York City Public Schools during initial years of school decentralization.*

           Advised Chancellor on policy and political issues, including regulation of community school districts, annual state legislative proposals, parent rights and student rights, school safety, expansion of G.E.D. program, development of alternative high school programs, conversion of commercial properties to school uses, restructuring of district

headquarters, creation of system's first offices for bilingual education and equal education.

Prepared Chancellor's policy statements, including lectures, speeches, budget messages, legislative proposals, hearing testimony.

Participated in final-level staff reviews of annual operating and capital budgets.  Staffed projects to reform high school diploma requirements and new procedures for selection of principals.

1963-70     Journalist
            New York City and Providence, R.I.

            Executive Editor, *Change in Higher Education* Magazine, 1968-70; Senior Editor, *Education News* Magazine, Cowles Communications Inc., 1967-68; Education Writer, *The Providence Journal,* 1963-67.  Received national awards.

1960-63     Commissioned Officer, U.S. Navy (U.S. Naval Security Group)
            Newport, R.I., Washington, D.C., Karamursel, Turkey.


**CONSULTING ASSIGNMENTS**

Tennessee.  Metropolitan Nashville Public Schools.,  2012-    .  Advisor to Board of Education and CEO of school district on diversity support and management.

New Jersey.  South Orange & Maplewood Public Schools, 1998-00.  Planning related to zoning of schools, development of a demonstration school, and equity/stability in a diverse school system.

Alabama.  State Department of Education, 1999-2003.  Advisor to State Superintendent of Education  for design and evaluation of plan for development of future local school superintendents in Alabama.

Berrien County Intermediate School District, Michigan, 1998.  Technical advice regarding development of ombudsman service.

South Carolina.  Beaufort County School District, 1997.  Analysis of special education program, in collaboration with Dr. David J. Rostetter.

Florida.  Assistance to the National Coalition of Advocates for Students re: preliminary planning of project in Palm Beach County School District, 1997.

Massachusetts.  Assistance to Panasonic Foundation re: preliminary planning of project in Boston Public Schools, 1997.

New Jersey.  North Brunswick Public Schools, 1993-94.  Development of district plan for managing diversity.  One-year planning process with extensive citizen/student/staff involvement.

Connecticut.  Stamford Public Schools, 1992-93.  Planning assistance on redistricting and magnet schools, including guidance on development of first-time application for federal magnet schools assistance.  1994: preliminary assessment of potential for magnet school expansion.

Minnesota.  Minneapolis Public Schools, 1991-92.  Planning assistance to city district and 8  suburban districts on development of interdistrict integration design.

Mississippi.  Site visits for Southeastern Desegregation Assistance Center to Cleveland and Winona school districts, 1992.

Minnesota.  St. Paul Public Schools, 1990-91.  Multiple workshops for school board, principals, school faculties on diversity and multicultural education .

Indiana.  Evansville-Vanderburgh School Corporation, 1991.  Workshop for school district administrators and principals on diversity and equity.

Ohio.   Office on School Monitoring & Community Relations, Cleveland, 1990-91.  Advisory assistance on desegregation compliance issues.

Minnesota.  Duluth Public Schools, 1990-91.  Workshops for school district administrators and school faculties on diversity and multicultural education.

Minnesota.  Albany Public Schools, 1990.  Workshop for school district staff on diversity and multicultural education.

Minnesota.  State Department of Education, 1990.  Workshop on multicultural education for local administrators from about three dozen school districts.

Indiana.  Marion County, 1990.  Workshop for coordinators of school integration for six school districts in metropolitan Indianapolis.

North Carolina.  Robeson County, 1990.  Technical assistance to Southeastern Desegregation Assistance Center on affirmative action issues in recently consolidated school district.

Mississippi.  Hattiesburg Public Schools, 1988.  Member of review team for Southeastern Desegregation Assistance Center for desegregation review of local school district.

Minnesota.  Minnesota State Board of Education, 1988.  Study of School Desegregation/Integration Costs in Minnesota.  Head of study team.

Wisconsin.  Metropolitan Milwaukee, 1988.  Two-day planning session for 24 school superintendents on operationalizing a multi-district consortium.

Ohio.  Beachwood Public Schools, 1988.  Workshop for school board and superintendent on use of data as leadership tool.

Missouri.  St. Louis: 1998, 1997, 1995, 1994, 1993, 1987: Training for court-appointed monitoring agency.  1977:  Presentation to citizen task force on informing communities about school desegregation.

Pennsylvania.  Harrisburg, 1987.  Member of panel for Pennsylvania Department of Education to review state concept paper on school equity.

Wisconsin.  Milwaukee Public Schools, 1987.  Two-day workshop on school-community relations strategies for senior managers of school district.

Wisconsin.  Beloit Public Schools, 1987-88.  Advisor on school desegregation  planning.

Pennsylvania.  Philadelphia Public Schools, 1986.  District workshops for parents on middle school reorganization in South Philadelphia.

Michigan.  Ann Arbor Public Schools, 1986.  Workshop for district task force on school monitoring.

Minnesota.  St. Paul Public Schools, 1984.  Workshop for district integration review committee.

Wisconsin.  Madison Public Schools, 1983-84.  Advisor to school district on desegregation planning.

Ohio.  Columbus, 1984.  Workshop for statewide conference of Ohio Department of Education on use of school data for community involvement.

Louisiana.  New Orleans, 1983.  Participant in NAACP "Educational Summit" on excellence and equity in education.

Connecticut.  New Haven,  1982.  Workshop for Connecticut Association of Boards of Education on school effectiveness.

Ohio.  Euclid, 1982.  Workshop for board of directors of Services for Independent Living on the role and function of the trustees of a nonprofit agency.

Michigan.  Ferndale Public Schools,  1981.  Workshop for district advisory commission on desegregation monitoring.

Ohio.  Youngstown, 1977.  Multiple presentations on desegregation strategies and community relations to trustees of Educational Opportunity Youngstown, Inc.

Massachusetts.  Boston Public Schools, 1975.  Member of University of Massachusetts-Amherst consultant team to English High School on magnet program development.

Massachusetts.  Springfield, 1974-75.  Policy and organizational advisor to board of trustees of Heritage Academy, a Hebrew Day School.

South Carolina.  Greenville, 1974.  Member, consultant team to Catholic schools on racial integration.

New York.   New York City, 1970.  Advisor to Martin Luther King Jr. Health Center on information dissemination.


**LITIGATION-RELATED ASSIGNMENTS**

Court-assigned consultant to Special Master in Tucson, Arizona school desegregation case, 2012.   [Fisher, Mendoza, U.S. v. Tucson Unified School District No. 1]

Educational expert for Plaintiffs for remedy planning in desegregation case in Fayette County, Tennessee, 2011 -  .[McFerren et al v. County Board of Education of Fayette County Tennessee et al]

Educational expert for Defendant School District in trial stage of desegregation, Metropolitan Nashville, Tennessee Public Schools, 2010-12.  [Spurlock v. Fox]

Educational expert for Plaintiffs in remedial/settlement stage of desegregation, Pickens County, Alabama, 2009-   .  [Lee v. Macon (Pickens County School System]

Educational expert for Mendoza plaintiffs in remedial stage of desegregation, Tucson, Arizona, 2006-12.  [Fisher, Mendoza, U.S. v. Tucson Unified School District No. 1]

Educational expert for plaintiffs in remedy development and implementation stage of metropolitan school desegregation, Hartford, Connecticut, 1996-  .  Testimony included. [Sheff v. O'Neill]

Educational expert for plaintiff-intervenors in remedial stage of desegregation, Ector County, Texas.  2005-06.  [U.S. and CRUCIAL et al v. Ector County Independent School District et al]

Educational expert for U.S. Department of Justice in remedial stage of desegregation, Covington County, Mississippi, 1999-2006.  Testimony included.   [U.S. v. Covington County School District]

Educational expert for plaintiffs in remedial stage of desegregation, San Francisco, California, 2004-05.  [San Francisco NAACP v. San Francisco Unified School District]

Educational expert for U.S. Department of Justice in remedial stage of desegregation, Chicago Public Schools, 2003-04.  [*U.S. v. Board of Education of the City of Chicago*]

Educational expert for U.S. Department of Justice in remedial stage of desegregation, Calhoun County, South Carolina,  2004.  [*U.S. v. Calhoun County School District*]

Educational expert for U.S. Department of Justice in remedial stage of desegregation, East Baton Rouge, Louisiana, 1999-2003.  [Davis]

Educational expert for U.S. Department of Justice in remedial stage of desegregation, Jackson-Madison County, Tennessee, 2000-03.  [Monroe]

Educational expert for plaintiffs in unitary status stage of desegregation in Fulton County Georgia, 2002-03.  [Hightower v. West]

Educational expert for U.S. Department of Justice in remedial stage of desegregation, Port Arthur, Texas, 2000-03.  [U.S. v. Texas Education Agency]

Educational expert for defendant Ravenswood City School District (East Palo Alto, California) in remedial stage of special education litigation, 2001-02.  [Emma C. v. Delaine Eastin]

Educational expert for plaintiffs in negotiations/implementation of settlement agreement involving school district restructuring and introduction of middle schools and magnet schools, and in subsequent litigation, Hillsborough County, Florida (Tampa), 1991-2001. Testimony included.  [*Manning*]

Educational expert for U.S. Department of Justice (plaintiff-intervenor) in remedial/ settlement stages of desegregation, Aldine, Texas, 1994-99.  [*Sampson*]

Educational expert for U.S. Department of Justice in remedial/settlement stages of desegregation, Midland, Texas, 1994-97.  Testimony included.  [*U.S.  v. Midland*]

Educational expert for NAACP in unitary status stage of desegregation in Dayton, Ohio, 2002.  Testimony included.  [*Goodwine et al v. Taft et al,* formerly *Brinkman*]

Educational expert for U.S. Department of Justice in remedial/settlement stages of desegregation, Seminole County, Florida, 1996-01.  [*U.S. v. Seminole County*]

Educational expert for plaintiffs in settlement/unitary status stages of school desegregation, Benton Harbor, Michigan, 1997-2001.  Testimony included.  [*Berry*]

Educational expert for plaintiffs in unitary status stage  of school desegregation, Charlotte-Mecklenburg, North Carolina, 1998-99.  Testimony included.  [*Swann*]

Educational expert for plaintiffs in remedial/settlement stages of school desegregation, Tuscaloosa, Alabama, 1998.  [*Lee, U.S.A., N.E.A., v. Macon County Board of Education*]

Educational expert for plaintiffs in remedial/settlement stages of school desegregation, San Jose, California, 1993-96.  Testimony included.  [*Vasquez*]

Educational expert for plaintiffs in remedial/unitary status stages of school desegregation, Muscogee County, Georgia  (Columbus), 1993-94.  Testimony included.  [*Lockett*]

Educational expert for U.S. Department of Justice in remedial/settlement stages of school desegregation, Franklin Parish, Louisiana, 1998.  [*U.S.A. v. Franklin Parish School Board*]

Educational expert for U.S. Department of Justice in unitary status stage of school desegregation, St. Louis, Missouri, 1995-96.  Testimony included.  [*Liddell*]

Educational expert for plaintiffs in unitary status stage of school desegregation, Duval County, Florida, 1997.  [*Jacksonville Branch NAACP*]

Educational expert for U.S. Department of Justice in remedial/settlement stages of school desegregation, Gadsden, Alabama, 1995.  [*Miller, U.S.A. and NEA*]

Educational expert for plaintiffs in remedy planning stage of school desegregation, Topeka, Kansas, 1994.  Testimony included.  [*Brown*]

Educational expert for plaintiffs in unitary status hearing on school desegregation, four school districts in New Castle County, Delaware (Wilmington), 1994.  Testimony included. [*Coalition v. State Board*]

Educational expert for plaintiffs in pre-trial stage of school desegregation/district consolidation, Rocky Mount, North Carolina, 1991.   [Rocky Mount]

Educational expert for plaintiffs at fairness hearing on desegregation settlement, U.S. District Court, Fort Wayne, Indiana, 1989.  Testimony included. [*Parents for Quality Education with Integration*]

Educational expert for Yonkers, New York Public Schools in remedy revision stage of school desegregation, 1987-89.   [Yonkers]

Educational expert for plaintiffs at remedy stage of school desegregation, Yonkers Public Schools, 1986.  Testimony included.  [U.S. and Yonkers Branch NAACP]

Representative of plaintiff-intervenors in pre-trial settlement negotiations in metropolitan school desegregation litigation, Milwaukee, Wisconsin, 1987.  [*Milwaukee*]

Expert witness on school desegregation, Pennsylvania Human Relations Commission, hearings regarding Philadelphia Public Schools, 1987.  Testimony included. [*Philadelphia*]


**REPORTS**

"Special Education Programs  in the Beaufort County School District," March 1997: report  prepared for school district.  Co-author with Dr. David J. Rostetter.

"Improving our Schools: Guidelines for an Effective Plan for Quality Integrated Schools," November 1996: a report by the Sheff plaintiffs in Hartford.  Primary author.

"Managing Diversity: A Plan for Action," April 1994: a district plan for managing diversity; and "Managing Diversity: Identifying Needs in a Changing School System," September 1993: an interview-based assessment of diversity-related school needs.
Both for the North Brunswick, New Jersey Township Public Schools.

Report regarding student assignment in Metropolitan Nashville Public Schools, 2010 and 2012.

Reports (3) regarding desegregation of Tucson Unified School District  No. One, 2007.

Report regarding desegregation of Ector County, Texas Public Schools, 2005.

Report regarding desegregation of Fulton County, Georgia Public Schools, 2003.

Declarations (2) regarding special education remedy analysis and monitoring protocols and methods in Ravenswood, California City School District, 2002.

Reports regarding desegregation of metropolitan Hartford public school districts, 2002 and 2004.

Report regarding desegregation of Dayton, Ohio Public Schools, 2002.

Report regarding desegregation of Benton Harbor, Michigan Area Schools, 2001.

Reports (desegregation evaluation and proposed desegregation plan) regarding desegregation of East Baton Rouge, Louisiana Parish Schools, 2000.

Report regarding desegregation of Charlotte-Mecklenburg, North Carolina Public Schools, 1999.

Report regarding desegregation of Tuscaloosa, Alabama City School System, 1998.

Report regarding desegregation of Hillsborough County, Florida Public Schools, 1996.

Report regarding desegregation of St. Louis, Missouri Public Schools, 1995.

Reports  regarding desegregation of Midland, Texas Independent School District, 1997 and 1995.

Report regarding desegregation of school districts of Brandywine, Christina, Colonial and Red Clay, Delaware, 1994.

Report regarding desegregation of the Topeka, Kansas Public Schools, 1994.

Report regarding desegregation of the San Jose, California Unified School District, 1993.

"Study of School Desegregation/Integration Costs in Minnesota" for the Minnesota State Board of Education, 1988.   An analysis of state categorical school funding to urban school districts.

"An Organizational Review" for the Community Desegregation Advisory Council, Indianapolis, Indiana, 1989.  Organizational analysis.  Primary author/head of study team.

Member, study team for review of interdistrict magnet schools and related desegregation issues, Benton Harbor/Coloma/Eau Claire Michigan, 1991-92.  An analysis of magnet school contribution to desegregation objectives.

Research assistance, report on "Planning for the Shepaug Valley [Connecticut] Regional School District in the 1990s," 1991.  A study of future directions.

Managed 200+ reports on desegregation progress in the Cleveland Public Schools for U.S. District Court, 1978-88.  Scope of reports: reading performance, high school dropouts, enrollment change, information management, desegregation financing, educational program planning, school closings, staff training, administrative decentralization.

    Special studies included:
      •organizational study of the Cleveland City School District
      •status report form to identify planning and preparation tasks for desegregation

•operating rules and training specifications for parent councils
•specifications for management information reports
•standards for compliance with nondiscrimination and educational equity
  requirements


PRESENTATIONS

Panelist, "Challenges to the Legality of Voluntary,  Race Conscious Desegregation Plans in Public Education," NAACP Legal Defense & Educational Fund Civil Rights Training Institute, Warrenton, Virginia, October 2002.

Panelist, "The Media and America's Schools," Hechinger Institute on Education and the Media, Teachers College, Columbia University, New York City, April 1998.

Speech, "Race in America," the Catalyst Endowment of the Hartford Foundation, Hartford, Connecticut, April 1996.

Keynote lecture, "Metropolitan School Desegregation, Education, and Court Decisions," one-day seminar at Hamline University School of Law, St. Paul, Minnesota, December 1994.

Co-Presenter, "Marshaling Resources for Desegregation Remedies: Balancing Federal Authority, State Responsibility and Local Accountability," American Education Finance Association annual conference, Albuquerque, New Mexico, March 1993.

Expert Witness, mock civil rights trial on "choice" plans in school desegregation, U.S. District Judge Robert Carter presiding, NAACP Annual Lawyers' Seminar, Indianapolis, July 1993.

Briefings (4), on results of planning process focused on diversity issues and involving stakeholder groups,  Board of Education, North Brunswick, New Jersey, 1993-94.

Presenter, practicalities in school desegregation litigation, annual seminar for civil rights attorneys, NAACP Legal Defense and Educational Fund, Warrenton, Virginia, November 1991.

Guest seminar leader, school desegregation issues, School of Law, University of Cincinnati, 1991.

Speech, "What Should be Done to Help the Cleveland Public Schools," Mayor's Monday Town Meeting, Cleveland, Ohio, September 1990.

Speech, national education issues, Phi Delta Kappa, Milwaukee Chapter, Milwaukee, Wisconsin, February 1990.

Speech, diversity and schools, Women's Court and Civic Conference of Greater Milwaukee, Milwaukee, Wisconsin, February 1990.

Workshop on metropolitan desegregation for Milwaukee Teachers Education Association, Milwaukee, Wisconsin, 1989.

Workshop on metropolitan desegregation for Milwaukee Administrators and Supervisors Council, Milwaukee, Wisconsin, 1988.

Speech, families and family preservation, statewide conference for child advocates, Ohio Institute for Child Advocacy, Columbus, Ohio, May 1988.

Lead Presenter, panel on "The Use of Research and Evaluation to Promote Educational Equity," American Educational Research Association, New Orleans, 1988.

Presenter, metropolitan school integration, regional conference for equity specialists, University of Michigan, November 1989.

Presenter on school desegregation, Danforth Foundation seminar for federal judges, Deer Valley, Utah, 1987.

Presenter, seminar on Chelsea Project, Boston University, November 1987.

Speech, "Observations on the Racial Integration Ideal in Housing and Education," 11th Annual Exchange Congress, Shaker Heights, Ohio, October 1987.

Speaker, conference on Milwaukee metropolitan-area school integration, Wingspread, Racine, Wisconsin, December 1987.

Speech on school integration and race equity, United Methodist Women, Mid-West Region, annual meeting, Cleveland, November 1987.

Keynote Speech on equity and excellence in education, community forum, St. Paul, Minnesota School District, May 1986.

Keynote Speech, "Educational Excellence and Equity," state conference of Ohio Department of Education, Columbus, October 1983.

Keynote Speech, "Racial Politics in Public Education," statewide conference of Ohio Department of Education, Columbus, April 1983.

Presenter, civil rights issues in education, National Education Association, annual conference on human and civil rights, Washington, D.C., February 1984.

Lectures, school desegregation legal history, graduate program for teachers and administrators, Kent State University, January 1987, January 1988, December 1988.

Speaker, national conference on school desegregation and school equity, St. Louis, January 1987.

Speech, school development as urban development, area foundation representatives, Cleveland, Ohio, January 1987.

Speech, condition of Cleveland city school system, American Association of University Women, Cleveland chapter, Cleveland, Ohio, March 1987.

Presenter, "Dropouts and Pushouts," NAACP annual convention, New Orleans, July 1983.

Speeches on Cleveland Public Schools, "Leadership Cleveland," Classes of 1979, 1980, 1982, 1983, 1984, 1985, 1988, Cleveland, Ohio.

Speech on educational equity, Hispanic Leadership Development Program, Class of 1986, Cleveland, Ohio.

Lectures on school reform issues, Education Policy Fellowship Program, Cleveland, Ohio, December 1987 and April 1988.

Speech, "Schools and Race Relations," Catholic Interracial Council, Cleveland, Ohio, November 1982.

Presenter, "Effective Schools Symposium" and follow-up workshop, Kent State University, July 1981 and October 1981.

Briefing on Cleveland Public Schools, Distribution Committee, Cleveland Foundation, March 1983.

Briefings on Cleveland Public Schools, The Greater Cleveland Roundtable, Cleveland, Ohio, March 1982, May 1983, July 1986, May 1988.

Speech, "More Myths of School Desegregation," Sigma Delta Chi, Cleveland Chapter, September 1979.

Speech, history and implications of school desegregation, Women's City Club of Cincinnati, March 1978.

Speech, school desegregation history and implications, Catholic Diocese of Youngstown, Ohio, September 1977.

Speech, "Is Quality Integrated Education Really Possible?," Phi Delta Kappa, Greater Cleveland Inter-University Chapter, March 1977.

Speech, community dimensions of school desegregation, Coalition of Religious Organizations, Columbus, Ohio, April 1977.

Guest lectures (est. 75) on school desegregation and education equity issues, Case Western Reserve University, Cleveland State University, Cuyahoga Community College, John Carroll University, Lake Erie College, Ursuline College, 1976-1988.

Speeches and Briefings (est. 300) on school desegregation history and implications for school faculties, boards of trustees, community and professional groups, churches and social service agencies, Greater Cleveland, 1976-88.


**TESTIMONY** [see also Litigation-Related Assignments]

Invited witness, hearing on civil rights, Ohio Advisory Committee to U.S. Commission on Civil Rights, Cleveland, Ohio, 1987.

Invited written testimony on Cleveland OH school desegregation, in "Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary," U.S. House of Representatives serial nr. 26, appendix 4, 1981.

Invited witness on school desegregation, President's Commission for a National Agenda for the Eighties, Los Angeles, 1980.

Witness, hearings on desegregation remedies for Cleveland Public Schools before Special Master of U.S. District Court, Northern District of Ohio, 1977.

Witness on school district-community relations, hearing before Committee on Education of Cleveland, Ohio, Board of Education, 1977.


**PUBLICATIONS**

Make Your Schools Work:  Practical, Imaginative and Cost-Free Plans to Turn Public Education Around, Simon and Schuster, 1975.  Co-author.

"School Desegregation, Press Coverage, and Public Perceptions," Imaging Education: The Media and Schools in America,, Teachers College Press, 1998.

"The Dilemma of Metropolitan School Desegregation," Education and Urban Society, SAGE Publications, November 1990.

"Where Next?," Brown Plus Thirty: Perspectives on Desegregation, Metropolitan Center for Educational Research and Training, New York University, 1986.

<u>More Than A Bus Ride: The Desegregation of the Cleveland Public Schools</u>, Office on School Monitoring & Community Relations, Cleveland, 1985.

"Racial Politics in Public Education," Ohio Department of Education, December 1983.

"Briefing Paper: Ability Grouping," Office on School Monitoring and Community Relations, Cleveland, 1980.

"A Checklist for Assessing School Desegregation Plans," Greater Cleveland Project, Cleveland, 1977.

"A Beginning Checklist for Assessing School Budgets in Desegregating School Districts," Greater Cleveland Project, 1977.

"The Redistribution of School Power:  A Populist Approach to Urban Education," <u>Controversiesin Education</u>, Saunders, 1974.  Co-author.

<u>Alternative Education within the Public Schools</u>, Croft Leadership Action Folio nr. 59, Croft Educational Services, Inc., 1973.

In <u>Change in Higher Education</u>
     Various editorials, 1969-70

In <u>The Cincinnati Enquirer</u>
     "Change Redefining What Citizens Want from School Movement," August 1, 1993.  Republished in <u>The Berkshire Eagle</u>, November 14, 1993.

In <u>Crain's Cleveland Business</u>
     "Case against Desegregation in Schools Tests Believability," August 12-18, 1996.

In <u>Education Week</u>
_____"To See or Not to See: Being Colorblind in a Color-Conscious Society," February 14, 2007.
     "The Place of Race in America," June 19, 1996.
     "'Separate but Equal' Has No Place," October 31, 1990.
     Republished in <u>UFT Bulletin</u>, New York State United Teachers, April 15, 1991.
     Condensed and republished in <u>The Berkshire Eagle</u>, _____1991.
     "If Schools Had Heeded Their 1960s Critics," June 1, 1983.
     "When You Are Against Busing, What Are You For?", February 9, 1983.

In <u>Equity and Choice</u> [Institute for Responsive Education]
     "Information and Equity," Winter 1987.
     "Forum," Spring 1985.
     "Reading Parity in Cleveland," Fall 1984.

In Equity and Excellence in Education [University of Massachusetts School of Education]
"Conventional Wisdom and School Desegregation," December 1997.

In Integrated Education
"The School Monitors," January-December 1983.
"Desegregation: Lessons of the Past and Future Opportunities," May-December 1981.

In Meforum, [University of Massachusetts School of Education]
"Dialogue: Designs for Inservice School Reform," Fall 1974.  Co-author.

In The New York Times
"On Desegregation: In School, Separate Is Still Unequal," May 9, 1983.
"More Money Is Not The Answer," June 22, 1975.
Republished in The Berkshire Eagle, Pittsfield, Massachusetts, ___ 1975.

In The New York Times Book Review
"Soft Thinking by the First School Reformer," November 29, 1970.
"In Brief:  Education," September 20, 1970.

In Phi Delta Kappan
"The Paradox of School Reform," February 1976.
"The Politics of Teacher Competence," September 1974.  Co-author.

In The Plain Dealer, Cleveland, Ohio
"The Law Has Been Implemented," September ___, 1988.
"The Issues: Completing Desegregation," October 6, 1985.
"Desegregation Works, and It Can Work Better," February 14, 1985.
"Wrong Time to Drop Desegregation Ball," February 22, 1984.
"Busing Did Not Cause Schools' Ills," January 12, 1983.
"Unworkable System Gets Blame for Cleveland's School Problems," June 24, 1981.
"Question Is How, Not Whether," October 8, 1977.

**EDUCATION**
Ed.D., University of Massachusetts-Amherst
B.S. *cum laude*, Boston University
A.A. with honors, Boston University
Superintendent certificate, Massachusetts

**COMMUNITY SERVICE**
 Former Member, Editorial Advisory Board, *Equity and Choice*, (subsequently *New Schools-New Communities*), Institute for Responsive Education, Boston.
Former Member, Board of Trustees, Institute for Child Advocacy, Cleveland, Ohio.
Former Member, Commission on Catholic Community Action, Cleveland, Ohio.

Judge, American Alumni Council magazine awards competition, New York City, 1969.

**HONORS**

Mexican American Legal Defense and Educational Fund, Community Service Award (with others), Tucson Desegregation Case, 2008.
Interchurch Council of Greater Cleveland, 1986.
Catholic Interracial Council, Cleveland, 1982.
Greater Cleveland Project, 1981.
Education Writers Association, four awards, 1966 and 1967.
Boston University, Reginald Coggeshall Award, 1959.
Who's Who in American Education and Who's Who in America.