IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

UNITED STATES OF AMERICA                                      PLAINTIFF

v.                                          CIVIL ACTION NO. 3:70-CV-00036-GHD

STATE OF MISSISSIPPI
(CHOCTAW COUNTY SCHOOL DISTRICT)                          DEFENDANT

MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO MODIFY DESEGREGATION PLAN

Presently before the Court is a motion to modify desegregation plan [10] filed by the

Defendant, Choctaw County School District. Upon due consideration, the Court is ready to rule.

## I.    *Factual and Procedural Background*

Choctaw County School District (the "District") serves all students in Choctaw County

and certain areas of adjacent Attala and Montgomery counties. The District currently operates

four schools: Weir Attendance Center (pre-K through grade 12), Ackerman Elementary (pre-K

through grade 6), Ackerman High School (grades 7 through 12), and French Camp Elementary

(pre-K through grade 8).

The District has three attendance zones. Students in the Weir zone attend Weir

Attendance Center for their entire primary and secondary education (pre-K through grade 12).

Students in the Ackerman zone attend Ackerman Elementary (pre-K through grade 6) and then

matriculate to Ackerman High (grades 7 through 12). Students who live in the French Camp

zone, which includes certain portions of the tri-county area of Attala, Montgomery, and Choctaw

counties, attend French Camp Elementary (pre-K through grade 8) and then matriculate to Weir

Attendance Center (grades 9 through 12) or elect to attend the private high school at French Camp Academy (grades 9 through 12).[1]

The District is one of many school districts in Mississippi that at one time practiced *de jure* race-based segregation, wherein African-American students were legally required to attend all-African-American schools and Caucasian students attended all-Caucasian schools. The District has been under the supervision and jurisdiction of this Court since July 9, 1970, when it was first ordered to submit a plan of desegregation for the purpose of dismantling its dual school system. The case commenced when the United States filed a complaint against several Mississippi school districts, including Choctaw County School District, seeking to have the school districts enjoined from continuing to operate compulsory biracial public school systems.

### 1970 Consent Decree

On July 9, 1970, the same date the case was filed, the Court entered an Order *pendente lite* requiring the United States and the District to "collaborate in the preparation of a plan for the immediate conversion of the Choctaw County School District to a unitary, nondiscriminatory school system[.]" *See* 1970 Consent Decree [10-1] at 1. Thereafter, the United States and the District agreed on a desegregation plan, and the Court entered a Consent Decree directing the District to announce and implement the plan. The Consent Decree further directed the District to "take such additional steps as are reasonable and necessary to terminate the operation of a dual system of schools based on race and to operate, now and hereafter, a single, non-racial unitary system of public schools." *Id.* at 2. The District was directed to file bi-annual reports with the Court beginning on October 15, 1970 and March 15, 1971, and on each date annually thereafter

---

[1] French Camp Academy is an interdenominational Christian boarding home and academy in French Camp, Mississippi, which accepts both boarding and non-boarding students. Boarding students at French Camp Academy attend French Camp Elementary through grade 8 and then attend the private high school at French Camp Academy for grades 9 through 12.

until further order of the Court. The District was ordered to report certain specified criteria with respect to desegregation efforts in student enrollment; staffing; the majority-to-minority transfer program; the number of inter-district transfers granted; the transportation system; the operation of school facilities; any present or proposed construction or expansion of facilities; the sale or abandonment of certain school facility, equipment, or supplies; as well as the existence of any bi-racial committee to the District's School Board and any process under which that committee would function.

As described below, the Consent Decree set out what was expected of the District in the following categories: 1. Faculty and Staff Desegregation; 2. Majority-to-Minority Transfer Policy; 3. Transportation; 4. School Construction and Site Selection; 5. Attendance Outside System of Residence; and 6. Desegregation of Classroom, Non-Classroom, and Extracurricular Activities.

*1. Faculty and Staff Desegregation*

The District was ordered with respect to faculty and staff desegregation to assign all principals, teachers, teacher aides, and other staff working directly with children at a school such that "in no case will the racial composition of a staff indicate that a school is intended for [African-American] students or [Caucasian] students." *Id.* at 4. The District was further ordered to ensure that the ratio of other staff members was "substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." *Id.* The District was ordered to direct staff members to accept new staffing assignments to the extent necessary to carry out the desegregation plan. The District was also ordered to hire, assign, promote, pay, demote, dismiss, and otherwise treat administrative staff working directly with children and professional staff without regard to race, color, or national origin. The District was ordered to

implement objective, reasonable, nondiscriminatory standards in demotion or dismissal decisions, and was further ordered not to fill a staff vacancy "through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so." *Id.* at 5.

### 2. *Majority-to-Minority Transfer Policy*

The District was ordered to implement a District-wide majority-to-minority transfer policy, wherein a student attending a school in which his or her race was in the majority could choose to attend another school in the District where his or race was in the minority. All transferring students were to be given priority for space being available and were to be provided transportation if desired.

### 3. *Transportation*

The District was ordered to conduct regular reexaminations of its transportation system to ensure that "[b]us routes and the assignment of students to buses will be designed to [e]nsure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis." *Id.* at 6.

### 4. *School Construction and Site Selection*

The District was ordered to conduct all school construction and site selection, including the location of any temporary classrooms, in "a manner which will prevent the recurrence of the dual school structure." *Id.* at 7.

### 5. *Attendance Outside System of Residence*

The District was further ordered to conduct any transfers of students living in the District to schools outside the District "on a non-discriminatory basis, except that it shall not consent to

4

transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual school system." *Id.*

### 6. Desegregation of Classroom, Non-Classroom, and Extracurricular Activities

Finally, the District was "prohibited from maintaining any classroom, non-classroom, or extra-curricular activity on a segregated basis, so that no student is effectively excluded from attending any class or participating in any non-classroom or extracurricular activity on the basis of race, color, or national origin." *Id.*

**Ensuing Reporting, Motion for Unitary Status, and 1989 Order**

In the subsequent years, the District submitted reports to the Court. According to the case docket, on April 1, 1985, the District moved for unitary status.[2] On November 20, 1989, the Court entered an opinion and Order, wherein it directed that a hearing concerning unitary status would be scheduled at a later date upon the District's request. The Court additionally ordered the United States to file any written objection at such hearing. This Court has no knowledge of any further proceedings concerning the District's motion for unitary status.

The 1989 Order further directed the District to continue submitting reports to the Court as required by the 1970 Consent Decree. The Court notes that besides the submission of reports, there was no activity on the docket from November 20, 1989 until October 23, 2012—nearly 23 years. On October 23, 2012, the District filed the present motion requesting that the desegregation plan be modified to alleviate some of the District's financial problems and to promote desegregation by consolidating Ackerman High School (grades 7 through 12) and grades 7 through 12 of Weir Attendance Center into one District-wide high school at the current site of Ackerman High School. The United States sought and was granted an extension of time

---

[2] The Court notes that although both parties have stated that the District has never moved to be declared unitary, according to the case docket, this is incorrect. *See* Civil Docket Sheet [1] at 8.

to attempt to resolve the matter with the District, and if the parties could not reach a mutual agreement, to submit a response to the motion to modify the desegregation plan.

On March 6, 2013, the United States filed its response in opposition to the motion, wherein it argued that the District's proposed modification was constitutionally inadequate, and proposed its own modification to the desegregation orders. The United States contends that the District's proposed modification "does not adequately further desegregation at the elementary and middle school level and instead places most of the burden of consolidation disproportionately and unjustifiably on the black students in the [Weir] community." *See* United States' Resp. & Partial Objection [23] at 8. The United States proposes that the Court order (1) consolidation of grades 9 through 12 of Ackerman High School and Weir Attendance Center at the current site of Ackerman High School; (2) consolidation of grades 6 through 8 of Ackerman High School, Weir Attendance Center, and French Camp Elementary at the current site of Weir Attendance Center; (3) consolidation of grades 3 through 5 of Weir Attendance Center and French Camp Elementary at the current site of Weir Attendance Center; and (4) creation of an early childhood center at the current site of French Camp Elementary serving pre-K through second grade students. The United States bases its proposal on a site visit it conducted from January 29, 2013 through January 31, 2013, joined by its expert, Dr. Leonard Stevens; its meeting with District representatives and community members concerning the District's proposed modification; Dr. Stevens' review and analysis of the current state of desegregation within the District and the District's proposed modification; and its review of numerous documents from the District.

On April 2, 2013, a hearing was held on the motion to modify the desegregation plan. The parties have now submitted proposed findings of fact and conclusions of law. The Court has

handled this matter in an expedited fashion, given the time constraints the District is under with respect to notifying its certified employees under contract of any non-renewals of contract. With all the foregoing in mind, the Court turns to the considerations presented by the case at hand.

## II. *Desegregation Case Law*

In determining whether to modify the existing desegregation orders in the case *sub judice*, this Court must draw on its equitable jurisdiction to supervise various aspects of local school administration. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 337 n.4, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999); *Freeman v. Pitts*, 503 U.S. 467, 491–92, 112 S. Ct. 1430, 118 L. Ed. 2d 108 (1992); *see also Lewis v. Casey*, 518 U.S. 343, 386, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (dicta) ("[W]e have sometimes closed our eyes to federal judicial overreaching, as in the context of school desegregation . . . . "). However, this Court is also well aware that "[r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *See Freeman*, 503 U.S. at 490, 112 S. Ct. 1430; *accord Missouri v. Jenkins*, 515 U.S. 70, 102, 115 S. Ct. 2038, 132 L. Ed. 2d 63 (1995) (ultimate goal in desegregation cases is "to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution"). Indeed, this Court "must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *See Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977). "When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course." *Freeman*, 503 U.S. at 490, 112 S. Ct. 1430. Although "the potential for discrimination and racial hostility is still present in our country, and

its manifestations may emerge in new and subtle forms after the effects of *de jure* segregation have been eliminated," the ultimate duty and responsibility lies with the State and its subdivisions. *See id.*, 112 S. Ct. 1430.

It should be noted that this litigation has been in progress for some 43 years. Thus, this Court looks to the case *sub judice* with a historical perspective. The first instruction comes in the seminal case *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954) (*Brown I*), and the subsequent mandate in *Brown v. Board of Education*, 349 U.S. 294, 301, 75 S. Ct. 753, 99 L. Ed. 1083 (1955) (*Brown II*). In *Brown I*, the United States Supreme Court reframed the issue of equality in public education, abandoning the old inquiry as to whether the facilities in "white" and "black" schools were equal; the new inquiry was whether segregation in public education was constitutional. *See Brown I*, 347 U.S. at 495, 74 S. Ct. 686. In answering the inquiry, *Brown I* overruled the "separate-but-equal" doctrine espoused in *Plessy v. Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), and did so with fury:

> We conclude that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal. . . . [T]he plaintiffs and others similarly situated for whom the actions have been brought are, but reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment.

*Id.* at 494–95, 74 S. Ct. 686. Relying in part on social science data on childhood development, the Court concluded that "[t]o separate [both elementary and high school children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* at 494, 74 S. Ct. 686.

*Brown II*, a call to action for progress in desegregation, directed each district court to retain jurisdiction over any desegregation cases brought before them until the respective school

had come into compliance with court orders. *See Brown II*, 349 U.S. at 301, 75 S. Ct. 753. Even in the days of widespread *de jure* segregation, *Brown II* imposed a good faith compliance standard, recognizing that "although [s]chool authorities have the primary responsibility for elucidating, assessing, and solving these problems courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles." *Id.* at 299, 75 S. Ct. 753.

Following *Brown II*, the United States Supreme Court was silent on the issue of desegregation until *Cooper v. Aaron*, 358 U.S. 1, 78 S. Ct. 1401, 3 L. Ed. 2d 5 (1958). In *Cooper*, the United States Supreme Court held that student unrest in the wake of *Brown II* and resistance on the part of Arkansas state authorities to the desegregation efforts of the Little Rock School Board were insufficient reasons to stall desegregation efforts. *See Cooper*, 358 U.S. at 8, 78 S. Ct. 1401.

Ten years later, in *Green v. County School Board of New Kent County, Virginia*, 88 S. Ct. 1689, 20 L. Ed. 2d 716 (1968), the United States Supreme Court held that "[i]n the context of the state-imposed segregated pattern of long standing," allowing students of either race to attend the previously desegregated schools "merely begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system." 391 U.S. at 436, 88 S. Ct. 1689. The goal in achieving desegregation, the Supreme Court explained, is "to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id.* at 437–38, 88 S. Ct. 1689. *Green* directed courts in desegregation cases to assess the cases before them "in light of the circumstances present and the options available in each instance" and to

> weigh that claim in light of the facts at hand and in light of any
> alternatives which may be shown as feasible and more promising
> in their effectiveness. Where the court finds the board to be acting
> in good faith and the proposed plan to have real prospects for

> dismantling the state-imposed dual system "at the earliest
> practicable date," then the plan may be said to provide effective
> relief.

*Id.*, 88 S. Ct. 1689.

*Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S. Ct. 1267, 28 L.

Ed. 2d 554 (1971), sheds further light on the duty of district courts in desegregation cases:

> Independent of student assignment, where it is possible to identify
> a "white school" or a "Negro school" simply by reference to the
> racial composition of teachers and staff, the quality of school
> buildings and equipment, or the organization of sports activities, a
> prima facie case of violation of substantive constitutional rights
> under the Equal Protection Clause is shown.

402 U.S. at 18, 91 S. Ct. 1267. *Swann* explained the duty of the school authorities is to first

"eliminate invidious racial distinctions. With respect to such matters as transportation,

supporting personnel, and extracurricular activities, no more than this may be necessary. Similar

corrective action must be taken with regard to the maintenance of buildings and the distribution

of equipment." *Id.*, 91 S. Ct. 1267. The *Swann* Court acknowledged that "[t]he construction of

new schools and the closing of old ones are two of the most important functions of local school

authorities and also two of the most complex." *Id.* at 20, 91 S. Ct. 1267. "[I]t is the

responsibility of local authorities and district courts to see to it that future construction and

abandonment are not used and do not serve to perpetuate or re-establish the dual system." *Id.* at

21, 91 S. Ct. 1267.

The Fifth Circuit noted in *Anderson ex rel. Anderson v. Canton Municipal Separate

School District*, 232 F.3d 450 (5th Cir. 2000), that in a determination concerning a proposed

modification to a prior desegregation order, the court

> must . . . remain at all times cognizant of the deference that must
> be accorded to school boards in their decisions such as the
> placement of schools; the location of a school comes within the

10

purview of the federal courts only to the extent that it has an impact on desegregation. This is because we lack the expertise and competence needed to dictate to school boards the location of new schools and the drawing of attendance zones.

232 F.3d at 454 (quoting *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 632 (5th Cir. 1988) (internal quotation marks omitted)). The Fifth Circuit explained that the court's place is not to decide whether the school board's proposed modification "is the best choice or even a wise choice." *Id.* Instead,

we must decide only whether the choice . . . violates the Constitution or federal law. To make that determination, federal courts ask only whether the proposed [modification] fails to further desegregation or places an inequitable transportation burden on black students. So long as neither answer is in the affirmative, we must defer to the expertise of school boards in decisions of this nature.

*Id.*

### III.    Analysis and Discussion

With all the foregoing in mind, the Court now turns to an examination of the District's proposed modification to the prior desegregation orders in the case *sub judice* and the United States' response and objections to the same. The District does not request at this time a declaration of unitary status. Thus, the Court's analysis is limited to a determination of whether the District's proposed modification is constitutionally adequate.[3] The Court does not address the United States' arguments that concern the procedure followed by the District in conducting

---

[3] The District's argument that the District has achieved good faith compliance with the Court's prior desegregation orders would be better presented in a motion for unitary status, which requires the Court to determine "whether (1) the school district has complied in good faith with desegregation orders for a reasonable amount of time, and (2) the school district has eliminated the vestiges of prior *de jure* segregation to the extent practicable." *See Anderson*, 517 F.3d at 297 (footnote omitted); *see also Freeman*, 503 U.S. at 492, 498, 112 S. Ct. 1430. The District should note that, according to pertinent case law, a motion for unitary status is proper once a school district has operated its school system for a period of 3 years in full compliance with the provisions of the desegregation orders, during which time it has engaged in no instances of intentional discriminatory activity. The motion for unitary status should state that the District has attained unitary status, eliminated all vestiges of any past discrimination, and fully satisfied the judgment of this Court, and that, accordingly, the injunction entered should be dissolved, the judgment discharged, the jurisdiction terminated, and the case closed and dismissed with prejudice.

11

its board meetings concerning the consolidation, whether the District properly considered the community response to its proposed school consolidations, minute details about the utilization of the District's facilities, micro-management of the District's budget, and other similar matters, which are not in the purview of this Court, as they do not touch the constitutional inquiry.[4]

### The District's Proposed Modification

The District proposes a consolidation of grades 7 through 12 at Ackerman High School and Weir Attendance Center at the current site of Ackerman High School in order to help with the District's mounting financial crisis and to promote desegregation in the District. Specifically, the District proposes moving all students who attend Weir Attendance Center in grades 7 through 12 to Ackerman High School, but maintaining the current attendance structure for all students in pre-K through grade 6 at Ackerman Elementary and Weir Attendance Center, as well as all students at French Camp Elementary in pre-K through grade 8.

For the 2012–2013 school year, the District reports a total student enrollment of 1,534 students, 540 (35%) of which are African-American, 970 (63%) of which are Caucasian, and 24 (2%) of which are of other races/ethnicities. The specific racial makeup of students at each of the District's four schools is shown on the table on the next page.

---

[4] The Court further notes that the United States' arguments that it was "prejudiced substantially" by the District's introduction of evidence at the hearing concerning the purported costs and cost savings of the District's current plan and that the Court should disregard hearing testimony from Dr. Michelle Larabee concerning the purported net cost of the United States' proposed plan and the purported cost savings of the District's current proposed plan are not well taken.

2012–2013 Choctaw County School District Student Enrollment

| School Name | Total Enrollment | African-American Enrollment | Caucasian Enrollment | Other Enrollment |
|---|---|---|---|---|
| Weir Attendance Center (pre-K–grade 12) | 344 | 206 (60%) | 133 (39%) | 5 (1%) |
| Ackerman Elementary (pre-K–grade 6) | 534 | 158 (30%) | 366 (69%) | 10 (2%) |
| Ackerman High School (grades 7–12) | 419 | 119 (28%) | 294 (70%) | 6 (2%) |
| French Camp Elementary (pre-K–grade 8) | 237 | 57 (24%) | 177 (75%) | 3 (1%) |

The District maintains that the proposed modification would have a beneficial effect on desegregation in that all students in the District in grades 9 through 12, and all students in grades 7 through 8 at Weir Attendance Center and Ackerman High School, would attend the same District-wide high school. The District contends that the proposed consolidation would result in a student enrollment of approximately 580 students in grades 7 through 12, 214 (37%) of which would be African-American and 3,602 (62%) of which would be Caucasian—reflecting District-wide racial balance in grades 7 through 12, as the District is currently comprised of 35% African-American students, 63% Caucasian students, and 2% students of other races/ethnicities. The District further maintains that the racial makeup of pre-K through grade 6 at Ackerman Elementary, Weir Attendance Center, and French Camp Elementary would remain unchanged. The District contends that "[t]he proposed modification, especially the consolidated high school, [would] facilitate educational and extracurricular opportunities for students, all with greater economies of scale." Dist.'s Mot. Modify Desegregation Plan [10] at 4.

The District contends that this modification would promote desegregation while simultaneously helping to alleviate its mounting financial crisis, caused in large part by a sizeable payment the District expected to receive from a recently constructed electrical plant that the District has not yet received. The District estimates that during the current school year it will have to draw upon its reserve funds to cover current operations. The District maintains that if the existing school plan is continued without change in the 2013–2014 school year, the District will end the 2013–2014 fiscal year with a zero balance in its 16th section interest fund and with a district maintenance fund balance of approximately $743,000 "such that the District would be in a deficit financial position for operations in 2014–[20]15, in derogation of its obligations under Mississippi law[,] and subject to takeover by the State Board of Education." *Id.* at 3.

### United States' Proposed Modifications

The United States agrees with the District's proposal to consolidate Ackerman High School (grades 9 through 12) with grades 9 through 12 of Weir Attendance Center at the current site of Ackerman High School, in effect creating one District-wide high school. However, with respect to the proposed consolidation of the seventh and eighth grades at Ackerman High School and Weir Attendance Center at the current site of Ackerman High School, the United States maintains that the District's proposed consolidation "places a disproportionate and unjustifiable burden of desegregation on the [African-American] students in the District" by only requiring the Weir students (61% of which are African-American) to be transported to the current site of Ackerman High School, and by not placing any burden on other students in the District. United States' Resp. & Partial Objection [23] at 10. The United States also maintains that the District's motivation for its proposed modification is to alleviate the District's financial distress, and that the proposed modification does not take into account the District's desegregation obligations.

14

The United States contends that "Weir is the only attendance zone in the District that is outside of ± 15 or 20% of the district-wide demographics and is consequently racially identifiable." *Id.* at 9. Thus, the United States proposes additional measures that would further the desegregation of Weir Attendance Center as a whole, which is comprised of pre-K through grade 12. The United States acknowledges that the proposed high-school consolidation would mean Weir Attendance Center would consist of pre-K through grade 6 students who reside in the Weir attendance zone and would be comprised of approximately 62% African-American students; the United States contends that Weir Attendance Center would thus remain a racially identifiable school in the wake of the District's proposed consolidation, and thus would fail to promote desegregation. *See id.* at 10.

### The Court's Findings

The Court's determination with respect to the District's proposed consolidation of grades 7 through 12 of Ackerman High School and Weir Attendance Center at the current site of Ackerman High School is based on the answer to two questions: (1) does the proposed consolidation fail to further desegregation; and (2) does the proposed consolidation place an inequitable transportation burden on African-American students. *See Anderson*, 232 F.3d at 454. In considering these two questions, the Court is mindful of the deference it must accord the District in such matters, as a proposed school consolidation generally is a matter within a school district's expertise and competence.

As the District has pointed out, the prior desegregation orders in this case do not set a standard to determine whether any of the District's schools are racially identifiable. Courts have commonly set either a ±15% or ±20% deviation from the overall student racial percentages to determine if a school is racially identifiable. *See United States v. Tex. Educ. Agency*, 679 F.2d

1104, 1114 (5th Cir. 1982) (using a 20% deviation); *see also United States v. Georgia*, 171 F.3d 1333, 1338 (11th Cir. 1999) (using a 20% deviation); *Williams v. Kimbrough*, CIV.A. 65-11329, 2010 WL 1790516 (W.D. La. May 3, 2010) (using 20% deviation); *Andrews v. City of Monroe*, CIV.A. 65-11297, 2012 WL 2357310 (W.D. La. June 20, 2012) (using 20% deviation). Based on either of these measures of deviation, Weir Attendance Center, composed of pre-K through grade 12, is the only school in the District that could be considered racially identifiable. For the 2012–2013 school year, the District has a total student enrollment of 1,534 students, 540 (35%) of which are African-American, 970 (63%) of which are Caucasian, and 24 (2%) of which are of other races/ethnicities. Weir Attendance Center has a total enrollment of 344 students, 206 of which are African-American (60% of the student enrollment), 133 of which are Caucasian (39% of the student enrollment), and 5 of which are of other races/ethnicities (1% of the student enrollment). The District's current enrollment by race is in stark contrast to Weir's current race ratio of students enrolled at the school and exceeds the allowable deviation. Thus, any modification to the prior desegregation orders should promote desegregation with respect to Weir Attendance Center while simultaneously not placing an inequitable transportation burden on the District's African-American students.

The Court finds that the District's proposed consolidation, insofar as it concerns the District's students in grades 9 through 12, promotes desegregation and does not place an inequitable transportation burden on the African-American students. The Court finds that grades 9 through 12 of Ackerman High School and grades 9 through 12 at Weir Attendance Center[5] should be consolidated at the current site of Ackerman High School. A consolidation of the District's grades 9 through 12 into one District-wide school will promote desegregation to the

---

[5] Grades 9 through 12 at Weir Attendance Center are composed of those students residing in the Weir attendance zone, as well as those students residing in the French Camp attendance zone who do not attend French Camp Academy.

extent possible for those grades and will not place any inequitable transportation burden on the African-American students.

Although the Court finds that the District's proposed consolidation, insofar as it concerns consolidating grades 7 through 8 of Ackerman High School and Weir Attendance Center, would help to promote desegregation, the Court notes the transportation burdens the majority-African-American Weir students would incur as a result of the District's proposed consolidation and finds that the District's proposed consolidation should be modified to include the French Camp students in grades 7 through 8. In this way, the students in grades 7 through 8 at Weir Attendance Center and French Camp can share the transportation burden. The Court thus finds that grades 7 through 8 District-wide should be consolidated at the current site of Ackerman High School.

Therefore, the Court finds that District-wide, grades 7 through 12 should be consolidated into one school at the current site of Ackerman High School.[6] The Court further finds that the newly consolidated school composed of District-wide grades 7 through 12 should be designated Choctaw County High School. In the event the District elects to treat the middle school as a separate entity, the two entities should be designated Choctaw County High School and Choctaw County Middle School, respectively.

The Court is cognizant of the fact that Weir is a more desirable location from a geographical standpoint. However, the Court notes that a consolidation of grades 7 and 8 at Weir would necessitate transporting 220 students (153 from Ackerman and 67 from French Camp), whereas a consolidation at Ackerman would necessitate transporting only 117 students

---

[6] The Court notes that there are portable buildings available on the French Camp Elementary campus that could be moved at the District's discretion to the current site of Ackerman High School if needed to accommodate the greater student enrollment.

(50 from Weir and 67 from French Camp). The Court has prepared the following two tables to illustrate the difference in transportation burden between the two consolidations.

**Consolidation of Grades 7–8 at Weir**
*\*Italics = transportation necessitated*

| White | Black | Other | Originating School and Grade |
|---|---|---|---|
| *57* | *18* | *0* | *Ackerman, 7th grade* |
| *51* | *24* | *3* | *Ackerman, 8th grade* |
| *23* | *4* | *0* | *French Camp, 7th grade* |
| *31* | *8* | *1* | *French Camp, 8th grade* |
| 8 | 15 | 0 | Weir, 7th grade |
| 10 | 17 | 0 | Weir, 8th grade |
| **Total Overall White Students: 180 (66.7%)** | **Total Overall Black Students: 86 (31.8%)** | **Total Overall Other-Race Students: 4 (1.5%)** | **Total Overall Students: 270** |
| **Total White Students Transported: 162 (73.6%)** | **Total Black Students Transported: 54 (24.5%)** | **Total Other-Race Students Transported: 4 (1.8%)** | **Total Students Transported: 220** |

**Consolidation of Grades 7–8 at Ackerman**
*\*Italics = transportation necessitated*

| White | Black | Other | Originating School and Grade |
|---|---|---|---|
| 57 | 18 | 0 | Ackerman, 7th grade |
| 51 | 24 | 3 | Ackerman, 8th grade |
| *23* | *4* | *0* | *French Camp, 7th grade* |
| *31* | *8* | *1* | *French Camp, 8th grade* |
| *8* | *15* | *0* | *Weir, 7th grade* |
| *10* | *17* | *0* | *Weir, 8th grade* |
| **Total Overall White Students: 180 (66.7%)** | **Total Overall Black Students: 86 (31.8%)** | **Total Overall Other-Race Students: 4 (1.5%)** | **Total Overall Students: 270** |
| **Total White Students Transported: 72 (61.5%)** | **Total Black Students Transported: 44 (37.6%)** | **Total Other-Race Students Transported: 1 (.8%)** | **Total Students Transported: 117** |

Although the Court realizes that a consolidation of the District's middle schools will involve transporting students from French Camp to the current site of Ackerman High School, and thus that French Camp students in grades 7 and 8 will have an increased transportation burden, the Court is of the opinion that this arrangement would promote desegregation and not place an inequitable burden on the majority-African-American Weir students in grades 7 through

18

8 residing in the Weir attendance zone.[7] The Court notes that the French Camp Elementary students in grades 7 and 8 are already transported regularly to Weir Attendance Center to attend certain classes, and Weir Attendance Center is only approximately eight miles from Ackerman High School. The Court additionally notes that those students in grades 9 through 12 who reside in the French Camp attendance zone are included in the Weir/Ackerman consolidation. The Court is of the opinion that this arrangement will not place an undue transportation burden on French Camp students in grades 7 through 8.

Finally, the Court finds that all District schools in grades pre-K through 6 shall remain unchanged. The District maintains that it desires "to leave an elementary school in each zone, recognizing the value of having schools close to where young elementary children live." Dist.'s Proposed Findings of Fact & Conclusions of Law [37] ¶ 19. The Court finds this argument to be persuasive and defers to the expertise and competence of the District in the decision concerning any consolidation of elementary schools within the District at this time.

The Court has noted throughout its review of this case that Weir Attendance Center is the only school in the District that could be considered racially identifiable. The Court notes that a consolidation of grades 9 through 12 of Weir and Ackerman, as well as a consolidation of grades 7 through 8 of Weir, Ackerman, and French Camp, will promote desegregation of those grades.

---

[7] The Court notes the District's concerns with respect to Mississippi Code section 37-7-315, which provides that in schools attended by students from three or more school districts, such as French Camp Elementary, which is attended by students in Montgomery, Attala, and Choctaw counties, "the use of the [school] shall not be changed, altered[,] or abolished except upon order of a majority of each of the school boards of the school districts . . . ." See MISS. CODE ANN. § 37-7-315. However, the Supremacy Clause of the United States Constitution applies in the case *sub judice*, which presents a federal question governed by federal law; thus, this Court's ruling on the proposed modification, which constitutes federal law, trumps state law as it pertains to this issue. See U.S. CONST. ART. VI, cl. 2 (providing that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"). This Court has jurisdiction to rule on the District's proposed school consolidation, and has retained jurisdiction over the District with respect to its compliance with the prior desegregation orders entered by this Court. French Camp Elementary is a school within the District and is thus subject to this Court's jurisdiction in matters pertaining to desegregation. Therefore, the District need not concern itself with seeking the approval of the boards of education of Montgomery and Attala counties in order for the students in grades 7 through 8 at French Camp Elementary to become a part of the District's consolidated middle school.

In pre-K through grade 6 at Weir Attendance Center, there is an approximate current total enrollment of 179 students, 111 of which are African-American (62% of the student enrollment), 63 of which are Caucasian (35.2% of the student enrollment), and 5 of which are of other races/ethnicities (2.8%). The Court notes that these numbers contrast with the District-wide ratio of 35% African-American students, 63% Caucasian students, and 2% students of other races/ethnicities. However, the Court also notes that "the harm being remedied by mandatory desegregation plans is the harm that is traceable to segregation, and . . . the Constitution is not violated by racial imbalance in the schools, without more." *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 761, 127 S. Ct. 2738, 168 L. Ed. 2d 508 (2007) (quoting *Milliken*, 433 U.S. at 280 n.14, 97 S. Ct. 2749); *see also Freeman*, 503 U.S. at 498, 112 S. Ct. 1430 (racial imbalance is "not tantamount to a showing that the school district [is] in noncompliance with the decree or with its duties under the law"); *Anderson*, 517 F.3d at 298 (although racial imbalance is relevant to the inquiry, "racial imbalance, without more, does not violate the Constitution"). "As the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school is a vestige of the prior *de jure* system." *Freeman*, 503 U.S. at 496, 112 S. Ct. 1430. [8]

---

[8] The Court notes as an aside that the *Parents Involved* decision highlights the Supreme Court's general "concern that racial balancing has no logical stopping point," *see Parents Involved*, 551 U.S. at 731, 127 S. Ct. 2738, and summarizes the current debate among desegregation scholars on racial balancing:

> Some [scholars] have concluded that black students receive genuine educational benefits [from racial balancing]. *See, e.g.*, Crain & Mahard, *Desegregation and Black Achievement: A Review of the Research*, 42 LAW & CONTEMP. PROBS. 17, 48 (Summer 1978). Others have been more circumspect. *See, e.g.*, HENDERSON, GREENBERG, SCHNEIDER, URIBE, & VERDUGO, HIGH–QUALITY SCHOOLING FOR AFRICAN AMERICAN STUDENTS, IN BEYOND DESEGREGATION 162, 166 (M. Shujaa ed. 1996) ("Perhaps desegregation does not have a single effect, positive or negative, on the academic achievement of African American students, but rather some strategies help, some hurt, and still others make no difference whatsoever. It is clear to us that focusing simply on demographic issues detracts from focusing on improving schools"). And some have concluded that there are no demonstrable educational benefits. *See, e.g.*, ARMOR

Even considering racial balancing as a factor, changes to the elementary school structure within the District in order to promote desegregation at Weir Attendance Center would likely upset the enrollment ratios at the other elementary schools in the District which more closely comport with the District-wide ratio. Finally, none of the United States' concerns would justify the astronomical costs that would result from this Court's order to bus the elementary school children. For all the foregoing reasons, the Court finds that the District's elementary school structure for the District's children in pre-K through grade 6 should remain unchanged.

## *IV. Conclusion*

In sum, the Court finds that the District's motion to modify desegregation plan [10] shall be GRANTED IN PART AND DENIED IN PART, as follows:

(1) Grades 9 through 12 of Ackerman High School and Weir Attendance Center[9] shall be consolidated at the current site of Ackerman High School;

(2) Grades 7 through 8 of Ackerman High School, Weir Attendance Center, and French Camp Elementary shall be consolidated at the current site of Ackerman High School;

(3) The new District-wide entity composed of grades 7 through 12 shall be designated Choctaw County High School;[10] and

---

& ROSSELL, DESEGREGATION AND RESEGREGATION IN THE PUBLIC SCHOOLS, IN BEYOND THE COLOR LINE: NEW PERSPECTIVES ON RACE AND ETHNICITY IN AMERICA 219, 239, 251 (A. Thernstrom & S. Thernstrom eds. 2002).

*Id.* at 761, 127 S. Ct. 2738.

[9] Grades 9 through 12 at Weir Attendance Center are composed of those students residing in the Weir attendance zone, as well as those students residing in the French Camp attendance zone who do not attend French Camp Academy.

[10] As noted in the opinion *supra*, in the event the District elects to treat the middle school as a separate entity, the two entities shall be designated Choctaw County High School and Choctaw County Middle School, respectively.

(4) The District's elementary school structure for grades pre-K through 6 shall remain unchanged.

A separate Order in accordance with this opinion shall issue this day.

All Orders not inconsistent herewith remain in full force and effect.

THIS, the _10_ day of April, 2013.

SENIOR JUDGE